**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JULIE LAMBERT,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:25-CV-02302-JRA<br><br>JUDGE JOHN R. ADAMS<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Julie Lambert challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1) The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g).[1] This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (*See* non-document entry of Oct. 27, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

---

[1] Venue is a thornier matter. In the complaint, the civil cover sheet, and the application to proceed *in forma pauperis*, Ms. Lambert stated she resides in Ohio. (*See* ECF #1 at PageID 2; ECF #1-3 at PageID 26, 27; ECF #2 at PageID 33). However, before filing suit, Ms. Lambert informed the Commissioner she moved from Ohio to Ocala, Florida. (Tr. 7).

Under 42 U.S.C. § 405(g), venue is proper in the "the judicial district in which the plaintiff resides." Ocala is in Marion County, Florida and thus is within the Middle District of Florida. *See* 28 U.S.C. § 89(b). Accordingly, venue is proper in that court, not here.

A district court may, in the exercise of its sound discretion, *sua sponte* dismiss the case or transfer it to the proper venue. *See Wright v. Comm'r of Soc. Sec.*, No. 07-cv-15403, 2008 WL 2246043 (E.D. Mich. May 30, 2008). At the same time, the Supreme Court has held § 405(g)'s venue provision is "waivable by the parties" when not timely raised. *See Mathews v. Eldridge*, 424 U.S. 319, 328 n.9 (1976). Because the Commissioner knew of Ms. Lambert's address change when she filed her complaint but chose to respond in this court without raising the issue of venue, I recommend the District Court find the issue waived and proceed to rule on the merits of the case.

## PROCEDURAL BACKGROUND

Ms. Lambert applied for SSI on December 6, 2023, alleging she became disabled as of June 6, 2022. (Tr. 161). After her claims were denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge. (Tr. 91, 102, 108). On October 29, 2024, Ms. Lambert (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 32-55). On November 21, 2024, the ALJ determined Ms. Lambert was not disabled. (Tr. 18-26). On August 22, 2025, Ms. Lambert notified the Commissioner that she moved to Florida. (Tr. 7). On August 29, 2025, the Appeals Council denied Ms. Lambert's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 416.1481). Ms. Lambert timely filed this action in the Northern District of Ohio. (ECF #1).

## FACTUAL BACKGROUND

### I. Personal and Vocational Evidence

Ms. Lambert was 47 years old on the alleged onset date and 50 years old at the administrative hearing. (*See* Tr. 71). She has completed some college and has no past relevant work experience. (*See* Tr. 208, 36).

### II. Relevant Medical Evidence

In October 2021, Ms. Lambert established care with Third Street Family Health Services and was diagnosed with recurrent depression and gastroesophageal reflux disease. (Tr. 276-77). Both her conditions were stable with medications. (Tr. 276). She returned in February 2022 and reported doing well with no symptoms. (Tr. 278).

In May 2022, the month before Ms. Lambert reported becoming disabled, she was treated at the emergency room for hyperglycemia (high blood sugar), fatigue, and malaise. (Tr. 591). She

was diagnosed with diabetes mellitus and prescribed medication to treat that condition. (Tr. 596). In June, she followed up with her regular primary-care provider. (Tr. 280). There, a physical examination noted normal findings. (Tr. 282). Her body-mass index was noted to be in the obese category. (*Id.*). Her medications were continued. (Tr. 281; *see also* Tr. 278-79).

Ms. Lambert followed up with her primary-care provider in October 2022, reporting her chronic high blood pressure had been gradually worsening while her diabetes had been improving. (Tr. 289). She reported she "frequently forgets" to take her blood-pressure medication, is compliant "some of the time" with her diabetes medication, and had not made any recommended lifestyle changes. (*Id.*). A physical examination yielded normal findings. (Tr. 290). She was additionally diagnosed with hyperlipidemia and prescribed medication. (Tr. 292). Her other conditions remained unchanged. (Tr. 291-92). Ms. Lambert returned to her primary-care provider for a routine follow-up in January 2023. (Tr. 295). A physical examination yielded normal findings. (Tr. 295-96). Her medications were continued unchanged. (Tr. 296).

Ms. Lambert returned to her primary-care provider in March 2023 after suffering a panic attack during jury duty. (Tr. 316). She recounted acute agoraphobia during jury service and she left in an attempt to prevent a panic attack. (*Id.*). She was threatened with criminal charges and needed a diagnosis to explain her actions to the courts, so a letter was printed describing her history of agoraphobia. (Tr. 316, 319). A physical examination noted high blood pressure, night sweats, blurry vision, occasional nocturia (waking up to use the restroom), headaches, dysphoric mood, nervousness, and anxiety, but otherwise normal findings. (Tr. 316-17). She was prescribed a new medication for high blood pressure and her other medications remained unchanged. (Tr. 318-19).

In August 2023 (the month she applied for benefits), Ms. Lambert returned to her primary-care provider, reporting increased anxiety and panic, particularly when in public. (Tr. 359). A physical examination noted fatigue, headaches, nervousness, and anxiety, but was otherwise normal. (Tr. 359, 361). She was prescribed more medication for anxiety, with direction to take "before going out to social areas." (Tr. 363).

Ms. Lambert followed up for routine blood-pressure monitoring in September 2023. (Tr. 372). She reported headaches, nervousness/anxiousness, fatigue, worsening memory loss, difficulty remembering words, speech difficulty, and inability to multitask. (Tr. 372). A physical examination noted a nervous and anxious mood and fatigue but otherwise yielded normal findings. (Tr. 372-74). Ms. Lambert's high-blood-pressure medications were increased. (Tr. 376). She stopped taking her diabetes medication due to myalgias, so she was prescribed a different medication. (*Id.*).

In October 2023, Ms. Lambert went to the emergency room reporting shortness of breath and chest pain. (Tr. 452, 458). Imaging indicated an acute exacerbation of chronic obstructive pulmonary disease (COPD) and small bilateral pleural effusions likely related to pulmonary edema. (Tr. 458). She was diagnosed with congestive heart failure, pleural effusion, and pulmonary edema with suspected COPD. (Tr. 465). She was discharged with additional medications, instructions to follow up with her primary care provider, and a referral to a cardiologist. (Tr. 466, 468-70).

Ms. Lambert met with the cardiologist in January 2024. (Tr. 515). She reported chest pain around her heart about four-to-five times a week, shortness of breath, swelling in both legs, lightheadedness, dizziness, fatigue, and exercise intolerance. (Tr. 515, 517). The cardiologist concluded she did not have myocardial infarction (*i.e.*, a heart attack) but diagnosed coronary

artery disease and chronic diastolic congestive heart failure. (Tr. 515, 519). She was prescribed nitroglycerin to take as needed for chest discomfort. (Tr. 519).

Ms. Lambert returned to her cardiologist in July 2024 for a "long overdue" follow-up visit. (Tr. 646). She reported fatigue and shortness of breath. (*Id.*). She was described as "medically noncompliant." (*Id.*). She was referred for an echocardiogram to evaluate her symptoms, but she did not pursue the study and her symptoms "have since resolved." (*Id.*). She was prescribed additional medication to control her blood pressure and instructed to complete the echocardiogram, which she did in August. (Tr. 650, 688). The test revealed no echocardiographic evidence of coronary artery disease, though she was hypertensive throughout and had to take medication to reduce her blood pressure before starting the test. (*Id.*). Ms. Lambert returned to her cardiologist that month and her medication was increased. (Tr. 693).

In September 2024, Ms. Lambert returned to her primary-care provider complaining of worsening anxiety and depression. (Tr. 695). A physical examination noted normal findings. (Tr. 698-99). She started on additional medication for her diabetes and depression, and was referred to counselling. (Tr. 699-700).

## III. Relevant Opinion Evidence[2]

In February 2024, in connection with her disability application, Ms. Lambert underwent a consultative psychological examination with Taylor Groneck, Psy.D., via telehealth. (Tr. 522-27).

[2] There is also a Residual Functional Capacity Questionnaire completed by Ophelia Ramirez-Mailloux, LISW, that was submitted to the Appeals Council. (Tr. 69-70). When the Appeals Council considers new evidence but declines to review the application for disability benefits, the district court may not consider that evidence in deciding whether to uphold, modify, or reverse the ALJ's decision. *See Templeton v. Comm'r of Soc. Sec.*, 215 F.App'x 458, 463 (6th Cir. 2007). Ms. Lambert does not ask this court to remand under Sentence Six of 42 U.S.C. § 405(g) to consider new material evidence, so this opinion cannot be considered here.

Her chief complaint was agoraphobia and the difficulty she had "for many years" being around people. (Tr. 522). Though she can go out in public "once in a while" and at less busy times, going out during busy times will cause an anxiety attack and she must return home. (Tr. 523). She also reported crying spells, racing thoughts, and excessive worrying. (Tr. 524). She denied receiving mental health treatment. (*Id.*). Dr. Groneck noted Ms. Lambert had slow speech; a severely anxious and depressed mood; adequate memory, insight, and judgment; and marginally adequate attention and concentration. (Tr. 525-26). Dr. Groneck diagnosed panic disorder with agoraphobia and depressive disorder. (Tr. 526-27). Dr. Groneck opined Ms. Lambert:

- Is not expected to have problems understanding or remembering instructions;
- May work at a slower pace due to interference from her anxiety and panic;
- Is not expected to have problems getting along with others or taking orders from a supervisor, but "working in large groups may be difficult" due to panic attacks; and
- May feel distressed by jobs requiring rapid and timed performance and working in large groups "would likely increase panic symptoms."

(Tr. 527).

In February 2024, state agency psychological consultant Audrey Todd, Ph.D., reviewed Ms. Lambert's file, including Dr. Groneck's report. (Tr. 75, 76-78). First, Dr. Todd found no limitations in understanding and memory. (Tr. 77). Second, Dr. Todd opined Ms. Lambert was moderately limited in completing a normal work schedule at a consistent pace without unreasonable breaks and not significantly limited in the other areas of sustaining concentration and persistence. (*Id.*). Dr. Todd explained Ms. Lambert "can sustain attention, concentration, effort, and pace for tasks requiring little independent judgment and involving minimal variations" with a "requisite schedule of work and breaks." (*Id.*). Third, Dr. Todd opined Ms. Lambert was

moderately limited in interacting appropriately with the general public, accepting instructions and criticism from supervisors, and getting along with coworkers without distracting them or exhibiting behavioral extremes and was not significantly limited in the other two areas of social interaction. (*Id.*). Dr. Todd explained Ms. Lambert can interact "frequently as needed with supervisors and peers and sufficiently for task completion," yet she can have "no more than occasional interaction with the public." (*Id.*). Last, Dr. Todd opined Ms. Lambert is moderately limited in responding to changes in the work setting, but not significantly limited in the other three areas of adaption. (*Id.*). Dr. Todd explained Ms. Lambert can "adapt adequately to situational conditions and changes with reasonable support and structure." (Tr. 78). On reconsideration review in May 2024, state agency psychological consultant Kathleen Malloy affirmed Dr. Todd's findings. (Tr. 88).

**IV. Testimonial Evidence**

Ms. Lambert explained she cannot work because it takes her a long time to understand and comprehend things. (Tr. 38). She also is weaker and slower, in part due to arthritis in her spine. (*Id.*). She tried many times to get a job. (*Id.*). She last worked in 2023 as a restaurant server, but she could not keep up with the speed of work or having to juggle multiple tasks. (*Id.*). Her brain "just kinda scrambles up like an egg." (Tr. 38).

She also experiences panic and anxiety attacks when she is around people, in large crowds, or in front of people. (Tr. 39-40). She described an anxiety attack where her mind would "scramble up," she froze, and had to call for help from a friend. (Tr. 40). She experiences anxiety attacks about four to five times a week and they last up to the full day depending on the trigger. (Tr. 41). She can notice and anticipate when her anxiety attacks are coming, but her panic attacks arrive suddenly and cause problems breathing. (*See* Tr. 40). She can bring herself down from an anxiety

attack while a panic attack is “more out of control.” (Tr. 40-41). She experiences panic attacks “every once in a while.” (Tr. 41). She has gone to the hospital previously because she has mistaken panic attacks for heart attacks. (Tr. 40). She can sometimes de-escalate her anxiety attacks from panic attacks. (Tr. 41). She struggled to receive counseling because she would experience these attacks even in the clinic. (Tr. 40).

Ms. Lambert also has insomnia and started a new sleep medication around the time of the hearing. (Tr. 38). She used to be “stricken with fight or flight” and, through counseling, has been able to retrain her mind. (*Id.*).

In addition to psychological symptoms, Ms. Lambert suffers from heart failure and is “on a ton of medication” for it. (Tr. 45). The stress from the condition and treatment can worsen her anxiety and forces her to avoid stressful situations. (*Id.*). She reported being told she had a heart attack in October 2023. (Tr. 46). She always carries nitroglycerin and an inhaler in case of sudden symptoms. (Tr. 45).

Ms. Lambert has also suffered from diabetes and high blood pressure for many years, for which she takes medications. (Tr. 48). When her blood pressure or blood sugar spike, she can experience headaches and stress. (*Id.*).

Ms. Lambert lives in her apartment rent free in exchange for cleaning the kitchen, bathroom, and other parts of her converted historical apartment building. (Tr. 41-42). She estimates it takes about 20 hours a week and no more than two to three hours a day. (Tr. 42, 47-48). She can clean late at night when everyone is asleep and she can work alone and at her own pace. (Tr. 41). She can clean for about 30 minutes before she must take a break, which ranges from 5 to 30 minutes. (Tr. 47). She estimated she can lift no more than five pounds, walk for five

minutes, and stand or sit still for 30 minutes without issue. (*See* Tr. 42-43). She does not use a cane or walker. (Tr. 45).

A typical day for Ms. Lambert starts with caring and feeding for her cat, working on sewing projects, painting gifts, cleaning her apartment and the rest of the building, donating any extra food or clothing, and cooking meals. (Tr. 43). She used to paint outdoor murals but cannot do so any longer. (Tr. 43, 40). She sometimes plays card games with her neighbor. (Tr. 43). But she also has four-to-five bad days a week. (Tr. 44). On those days, she will stay in her apartment stuck in a cycle of negative thoughts. (Tr. 44). She cried while describing her bad days. (*See id.*).

Ms. Lambert holds a driver's license. (Tr. 37). Sometimes she must stay home or pull over when she has anxiety attacks or panic attacks while driving. (Tr. 38). She will drive to the grocery store when she feels she is able to, otherwise she must be driven to the store. (Tr. 39). She can follow along when watching television, though she must sometimes slows shows down. (Tr. 39).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 404.1520(c)-(f), 416.920(c)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Lambert had worked since her July 17, 2023 application date, but that work did not constitute substantial gainful activity. (Tr. 20). At Step Two, the ALJ identified the following severe impairments: diabetes mellitus, obesity, hypertension, hyperlipidemia, hypertensive cardiovascular disease, coronary artery disease, congestive heart failure, anxiety disorder, depressive disorder, and panic disorder with agoraphobia. (*Id.*). At Step Three, the ALJ found Ms. Lambert's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 21-22). At Step Four, the ALJ determined Ms. Lambert's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except the claimant cannot climb ladders, ropes, or scaffolds.

> She is limited to performing simple, routine, repetitive tasks. She can have frequent interactions with supervisors and coworkers, but no more than occasional interactions with the public. She can experience no more than occasional, minor changes in duties, routine and the work setting. The claimant can occasionally climb ramps and stairs. She can have occasional exposure to concentrated irritants such as visible dust clouds, noxious odors, caustic fumes, and other such pulmonary irritants. She can also have no exposure to workplace hazards such as unprotected heights or dangerous, unprotected moving mechanical parts. Additionally, she can perform no more than 4 hours of standing and/or walking during the workday. She can also have no exposure to humidity and extreme heat or cold. She would perform no duties at a production-rate pace, such as one has with assembly-line work. The claimant would also be off-task 5% of the time during the workday due to various symptoms.

(Tr. 22). Because Ms. Lambert had no past relevant work, the ALJ proceeded to Step Five. (Tr. 25). At Step Five, the ALJ found Ms. Lambert could perform other work, including as a merchandise marker, small-product assembler, and routing clerk. (Tr. 25-26). Thus, the ALJ concluded Ms. Lambert was not disabled. (Tr. 26).

## Standard of Review

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the

substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Ms. Lambert argues substantial evidence does not support the RFC because the ALJ did not account for her limited ability to be around large groups of people or maintain work attendance. (ECF #12 at PageID 780). The Commissioner responds the RFC accounts for those limitations by limiting her to frequent interaction with coworkers and occasional interaction with the public, substantial evidence supports those limitations, and the ALJ properly rejected the opined large-group limitation as vague. (ECF #16 at PageID 795-97).

The ALJ limited Ms. Lambert to frequent interaction with coworkers and occasional interaction with the public. (Tr. 22). The ALJ explained that limitation in the RFC section alongside others: "As discussed in the 'paragraph b' section, her moderate mental limitations in domains 2, 3, and 4 would reasonably limit her to simple, routine, repetitive tasks, with the social limitations and no more than occasional, minor changes in duties, routine, and the work setting." (Tr. 24). Looking to the ALJ's Paragraph B findings at Step Three, the ALJ explained the finding that Ms. Lambert was moderately limited in her ability to interact with others:

> In interacting with others, the claimant has a moderate limitation. The claimant reported increased anxiety and panic in August 2023, particularly when she is out in public. Dr. Groneck noted that she goes grocery shopping early in the morning to avoid crowds of people. She was cooperative and pleasant at the exam and rapport was easily established, which was corroborated at the hearing as well. Therefore, she has moderate difficulty in this area.

(Tr. 21) (citations omitted).

Substantial evidence supports the ALJ's analysis as the RFC matches the opinions of the state agency psychological consultants. It is well established that state agency consultative opinions may constitute substantial evidence supporting an ALJ's decision. *See Maldonado o/b/o A.C. v. Kijakazi*, No. 4:20-cv-1878, 2022 WL 361038, at *6 (N.D. Ohio Jan. 14, 2022) (collecting cases),

*report and recommendation adopted,* 2022 WL 356557 (N.D. Ohio Feb. 7, 2022). The state agency psychological consultants opined Ms. Lambert was moderately limited social interaction and limited her to interact "frequently as needed with supervisors and peers and sufficiently for task completion," yet she can have "no more than occasional interaction with the public." (Tr. 77, 88). Neither included a specific limitation on the number of people with whom Ms. Lambert could interact. The ALJ found those opinions "generally persuasive" although the ALJ used different wording. (Tr. 25). While the ALJ reworded other parts of the opinion, the RFC matches the opinions directly with limitations to frequent interaction with coworkers and occasional interaction with the public. (Tr. 22).

Ms. Lambert points to other evidence establishing her agoraphobia as supporting a limitation from working in large groups. (*See* ECF #12 at PageID 781). Specifically, Ms. Lambert cites a time in 2023 when she had to leave jury service due to a severe panic attack and treatment notes from 2023 documenting her worsening agoraphobia and new prescription for medications to take before leaving her home. (*See id.*) (citing Tr. 341, 359, 363). Even if the Court determined that evidence shows Ms. Lambert should have greater limitations, the state agency psychological consultants' opinions still provide substantial evidence in support of the RFC and the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

Ms. Lambert argues the RFC conflicts with Dr. Groneck's consultative opinion, which found "working in large groups may be difficult for the claimant due to panic attacks." (ECF #12 at PageID 781-82; ECF #17 at PageID 802; *see also* Tr. 527). If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted. *See*

Soc. Sec. Ruling (SSR) 96-8p, 1996 WL 374184, at *7 (July 2, 1996). Ms. Lambert correctly points out the ALJ found Dr. Groneck's opinion persuasive. (ECF #12 at PageID 782) (citing Tr. 24). But that is not all the ALJ had to say on the matter. The ALJ found "[a]lthough the findings are somewhat vague and do not give specific functional limitations, the overall moderate findings are generally supported by the overall evidence of record." (Tr. 25). An ALJ need not adopt an opinion verbatim or adopt the limitations wholesale, even if the ALJ finds the opinion persuasive. *Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). When a medical opinion does not actually describe the extent of functional limitations, the ALJ may properly consider the opinion too vague and, subsequently, reject those vague limitations. *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F.App'x 422, 434 (6th Cir. 2018) (affirming the ALJ's conclusion the discounted opinion was "quite vague").

Dr. Groneck opined "working in large groups may be difficult" for Ms. Lambert due to panic attacks. (Tr. 527). This statement does not identify what constitutes a "large" group, does not describe the extent of the difficulties that may arise, and leaves open the possibility that those difficulties may not arise. This statement hardly compels a finding of "Ms. Lambert's inability to work around large groups of people." (ECF #12 at PageID 767). Rather, the ALJ rightly omitted this statement because it was vague. *See Albrecht v. Comm'r of Soc. Sec.*, No. 1:14-cv-2116, 2015 WL 4985475, at *6 (N.D. Ohio Aug. 18, 2015) ("Dr. Dallara's opinion that Albrecht *may* have 'some difficulties' relating to others or *may* have 'some difficulties' withstanding the stress/pressure associated with day-to-day work hardly compels the inclusion of the limitations Albrecht suggests" and Dr. Dallara "only opines that Albrecht *may* have problems in the identified areas, a rather cautious statement that suggests there is also a significant chance that no problems will arise" and

"the statement that Albrecht might have 'some difficulties' fails to express an opinion as to the severity of those difficulties in the event they materialize") (emphasis in original).

Ms. Lambert analogizes her case to *Stoodt v. Comm'r of Soc. Sec.*, in which the ALJ included many mental limitations but did not include a limitation contained in the state agency psychological consultant's opinion to avoid large groups of ten or more people. (*See* ECF #12 at PageID 783-84) (citing *Stoodt*, No. 3:20-cv-2370, 2022 WL 721455 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted,* 2022 WL 716105 (N.D. Ohio Mar. 10, 2022)). The state agency consultants opined the claimant in *Stoodt* should avoid interacting with large groups (defined as ten or more people) and be limited to brief and superficial interactions with others (each undefined). *Stoodt*, 2022 WL 721455, at *16. The court in *Stoodt* accepted the opinion's definition of large groups, spent much effort determining what "brief" and "superficial" might mean, and considered whether the ALJ's limitation to "occasional interactions with others" and "no team or tandem tasks" accounted for the opined limitations. *Id.* at *16-18. In the end, the court remanded the matter because the ALJ did not explain whether the RFC effectuated the opinion or if the ALJ concluded the opinion was unpersuasive. *See id.* at *17-18.

Two key differences show the ALJ here did not commit the same error as did the ALJ in *Stoodt*. First, Dr. Groneck did not define large groups. Drs. Kristen Haskins and Jamie Lai, the state agency psychological consultants that opined on Mr. Stoodt's mental limitations, each defined large groups as "ten or more people." *See Stoodt*, 2022 WL 721455, at *6-7. In contrast, Dr. Groneck did not explain what makes a group large enough to trigger Ms. Lambert's greater limitation. (*See* Tr. 527). This leads to the second difference: the ALJ provided greater analysis based on Dr. Groneck's lack of specificity. In *Stoodt*, the ALJ's analysis of the two state agency

psychological consultants' opinions was threadbare: the ALJ in *Stoodt* found "'The mental assessment of Kristen Haskins, PsyD., the State Agency's psychological consultant at 1A and 2A is persuasive. [C]onsistent with and supported by the evidence'" and made no mention of Dr. Lai's opinion. *See* 2022 WL 721455, at *14. Both doctors opined to the limitations. *See id.* at *6-7. In contrast, the ALJ here found regarding Dr. Groneck's opinion, "[a]lthough the findings are somewhat vague and do not give specific functional limitations, the overall moderate findings are generally supported by the overall evidence of record." (Tr. 25). This extra explanation provided the piece that was missing in *Stoodt*: the ALJ found the undefined large-group limitation vague and intended the RFC to effectuate the parts of the opinion that proposed specific limitations. *Contrast Stoodt* 2022 WL 721455, at *17 (N.D. Ohio Jan. 13, 2022) ("[I]t is simply not clear from the record whether the ALJ intended her RFC limitations to <u>effectuate</u> the psychological consultants' limitations, or instead concluded that the record <u>did not fully support</u> the consultants' stated limitations.") (underlines in original). Thus, while *Stoodt* is an analogous case, the ALJ here did explain the reasoning for why the large-group limitation was omitted.

Turning to Ms. Lambert's arguments about absenteeism, she contends her testimony in the hearing that she self-isolates in her apartment in a cycle of negative thoughts about four to five times a month warranted a limitation in the RFC about absenteeism. (ECF #12 at PageID 781) (citing Tr. 44). Ms. Lambert continues the VE opined had she been found to be absent from work two days a month, she could not maintain competitive employment. (*Id.* at PageID 783) (quoting Tr. 52). But, as the Commissioner points out, the ALJ found Ms. Lambert's testimony about the severity of her symptoms to be unsupported by the record and Ms. Lambert does not challenge the ALJ's evaluation of her testimony. (ECF #16 at PageID 796). So, her testimony is not substantial

evidence that she would be absent twice a month. *See Thorpe v. Comm'r of Soc. Sec.*, No. 1:21-cv-2119, 2022 WL 17418149, at *10 (N.D. Ohio Sept. 27, 2022), *report and recommendation adopted,* 2022 WL 17089770 (N.D. Ohio Nov. 21, 2022).

Last, in her reply, Ms. Lambert argues there is no evidence supporting the ALJ's finding that she would be off task 5% of the workday and the number was arbitrarily set below the 15% threshold for competitive employment the VE referenced. (ECF #17 at PageID 806-07). She also raises other limitations Dr. Groneck opined but were omitted from the RFC. (*Id.* at PageID 803-04). It is unclear whether Ms. Lambert intended these arguments as additional challenges to the Commissioner's decision or merely a criticism of the Commissioner's brief for mentioning the off-task limitation or citing Dr. Groneck's findings as substantial evidence in support of the RFC.

To the extent Ms. Lambert intended to raise in her reply brief a challenge to the RFC's finding that she would be off-task 5% of the time, such an argument should be treated as waived because new arguments cannot be raised for the first time in a reply brief. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). Ms. Lambert originally challenged the RFC's limitations on absenteeism, not off-task time. Although absenteeism and off-task time are interrelated, they are nevertheless vocationally distinct concepts. *See Reid v. Saul*, No. 5:19-cv-173, 2020 WL 4805454, at *1 (W.D. Ky. Aug. 18, 2020). While Ms. Lambert did have a change in counsel between filing her opening brief and her reply brief (*see* ECF #13-14), there are no extenuating circumstances suggesting that Ms. Lambert's prior counsel could not effectively represent her. *Contrast Chapman v. Saul*, No. 1:18-cv-1616, 2019 WL 3773736, at *4 (N.D. Ohio Aug. 12, 2019) (declining to find a new argument waived due to prior counsel's significant personal and health issues at the time of authoring the opening brief). Instead, if Ms. Lambert's

new counsel wanted to raise new challenges, he should have sought leave so this court could potentially order supplemental briefing. I thus recommend the District Court consider these arguments waived.

## CONCLUSION AND RECOMMENDATION

After review of the record, the parties' arguments, and the law, I recommend the District Court **AFFIRM** the Commissioner's decision denying supplemental security income.

Dated: September 29, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).**